UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

LASHAWN DAVIS,                                            :

                  Petitioner,           :       **MEMORANDUM DECISION**

      - v -                                              :       20-CV-03178 (DC)

MARK ROYCE, Superintendent of the Green   :
Haven Correctional Facility,

                                      :

                  Respondent.

                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APPEARANCES:       LASHAWN DAVIS
                           Petitioner *Pro Se*
                           DIN 14-A-2737
                           Green Haven Correctional Facility
                           P.O. Box 4000
                           594 Route 216
                           Stormville, NY 12582

                           LETITIA JAMES, Esq.
                           Attorney General of the
                           State of New York
                           By:   Nikki Kowalski, Esq.
                                  Deputy Solicitor General for
                                  Criminal Matters
                                  Lisa E. Fleischmann, Esq.
                                  Assistant Attorney General
                           28 Liberty Street
                           New York, New York 10005
                                Attorneys for Respondent

CHIN, Circuit Judge:

On June 6, 2014, following a jury trial, Petitioner Lashawn Davis was convicted in the Supreme Court of the State of New York, Queens County (Lopresto, J.), of two counts of first-degree burglary, one count of first-degree attempted robbery, one count of second-degree attempted robbery, and one count of second-degree assault. Dkt. 12-2 at SR 12; Dkt. 12-4 at 2, 15.  On June 6, 2014, the court sentenced Davis principally to concurrent, indeterminate prison terms of 22 years to life on each count. Dkt. 12-2 at SR 12; Dkt. 12-4 at 15.  On April 24, 2019, the Appellate Division, Second Department unanimously affirmed Davis's conviction, *People v. Davis*, 96 N.Y.S.3d 886 (Mem) (2d Dep't 2019) ("*Davis I*").  On July 11, 2019, the New York Court of Appeals denied leave to appeal.  *People v. Davis*, 130 N.E.3d 1287 (Table) (N.Y. 2019) (Garcia, J.) ("*Davis II*").  Dkt. 12-4 at 15-17.

On July 13, 2020, proceeding *pro se*, Davis filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this Court (the "Petition").  Dkt. 1.  Davis contends that his rights under the Sixth Amendment's Confrontation Clause were violated because the trial court allowed "a criminalist who did not take part in the DNA testing, and who served only as a conduit for the conclusions of other analysts with whom she 'agreed to agree' to introduce the DNA reports into evidence and to testify about the results of the testing." Dkt. 1 at 2.  Respondent Mark Royce, represented by the New York State Attorney General's Office, filed his opposition memorandum on

February 2, 2021. Dkt. 12-4. Davis did not reply. On October 25, 2023, the case was reassigned to the undersigned.

For the reasons that follow, the Petition is DENIED.

## STATEMENT OF THE CASE

**A.  *The Facts*[1]**

The evidence at trial established the following:

In June 2011, Carmen Cruz encountered Davis, a tall, heavy-set, African American man, while watering the plants in front of her house. Dkt. 12-1 at 419-20, 458-62. Davis was smoking a cigarette and carrying a green towel and what appeared to be a "toolbox." *Id.* at 419-20, 463-64. Cruz asked Davis, "[C]an I help you?" In response, Davis asked Cruz for water. *Id.* at 419, 460-62. As Cruz gave Davis a drink of water, she noticed a young Hispanic male hiding behind a tree in front of her property. *Id.* at 419-20, 433, 463-65. Alarmed and uneasy, Cruz entered her home and tried to shut the door "as quick as she could." *Id.* at 420-21, 466. But Davis pressed his way in and stopped her from closing the door. *Id.* at 466. In the ensuing struggle, Davis gave Cruz a "good push," which injured Cruz's thumb. *Id.* at 421. Now inside Cruz's foyer, Davis dropped the cigarette, "toolbox," and green towel he had been holding. *Id.* at 421-22, 468, 471-72. The accomplice, whom Cruz had spotted behind a tree, eventually joined

---

[1] The facts are derived from the transcript of Davis's jury trial. Dkt. 12-1.

3

Davis inside of the home. *Id.* at 422, 468-72. Neither man was wearing gloves or a face covering. *Id.* at 480.

Together, Davis and his accomplice carried Cruz upstairs into her second-floor bedroom. *Id.* at 422-25, 469-70, 472. Davis's accomplice held Cruz down in a recliner while Davis demanded that she tell them where she kept her money. *Id.* at 423, 474-76. Cruz tried to raise her voice to wake her adult daughter, who was sleeping upstairs in the house. *Id.* at 423-24, 427. Upset that Cruz raised her voice, Davis pulled a gun from his waistband and struck Cruz in the face (along her right cheekbone). *Id.* at 423-25. The men then tied Cruz's hands together with the straps from a purse in her room and covered her mouth with a t-shirt as they continued searching for money. *Id.* at 424-26. After sensing movement in the house, Davis and his accomplice fled without any of Cruz's property. Cruz's daughter chased after the men, but she did not catch up to them. While outside, she was met by the police, whom Cruz's neighbor had called. The men were not apprehended. *Id.* at 426-29, 450-51, 481-82, 513-14.

Around 11 a.m., Detective Sean Roche interviewed Cruz, received descriptions of the intruders, and spoke with the 911 callers. *Id.* at 503-13, 527-28. About two hours later, Police Officer Gaetano Emmolo and his partner arrived at Cruz's house to photograph the scene, collect and secure any evidence, and dust for fingerprints. Emmolo did not find fingerprints, but he vouchered the green towel,

4

cigarette, and "toolbox" left in the foyer. *Id.* at 572-74, 575-80, 590-92, 660-62, 708-10, 713-15, 720, 738. He collected the purse strap used to tie Cruz's hands together and the t-shirt used to cover Cruz's mouth; he also collected spots of blood that, according to Cruz, belonged to one of the perpetrators and an elimination swab of DNA from Cruz. Emmolo submitted all the items to the Office of the Chief Medical Examiner (the "OCME") for DNA testing. *Id.* at 578, 586-87, 654-56, 668-75, 706-08. On July 18, 2011, the investigation and case were closed. *Id.* at 514-16.

In November 2011, however, the investigation and case were reopened after a DNA "hit" from the green towel and cigarette left at the crime scene. The investigation was subsequently reassigned to Detective Roche. *Id.* at 516. On February 8, 2012, Detective Roche arrested Davis and brought him to the 109th Precinct. That same day, Detective Roche conducted a lineup that included Davis and five others. Cruz viewed the lineup; however, she failed to identify Davis. *Id.* at 516-22, 544-64.

Six months later, on August 21, 2012, Detective Roche took a DNA swab (buccal swab) from Davis. Detective Roche then placed the swab inside a sealed envelope and brought it back to the precinct. *Id.* at 522-24. The precinct then sent the swab to the OCME for testing. *Id.* at 714. The OCME tested the swab and was able to develop a complete DNA profile. It then compared the DNA profile from the swab with the DNA profiles found on the green towel and cigarette at the crime scene; it also compared the DNA profiles found on the green towel and cigarette at the crime scene

5

with a "known specimen number 9969815A from the New York State DNA data bank." *Id.* at 715. The DNA profiles were the same: a match to Davis. Each comparison was "made within a reasonable degree of scientific certainty." *Id.* at 714-16.

On October 29, 2012, Hurricane Sandy flooded the storage facility where the DNA evidence from the cigarette and green towel was being stored -- as a result, the DNA evidence was contaminated and never retrieved for further examination or presentation at trial. *Id.* at 684-95.

**B.**   *Procedural History*

   **1.**   *State-Court Proceedings*

      **a.**   *The Trial Court*

A Queens County grand jury charged Davis with three counts of first-degree burglary, one count of attempted first-degree robbery, one count of second-degree burglary, one count of attempted second-degree robbery, one count of second-degree assault, and one count of fourth-degree weapon possession. Dkt. 12-4 at 2.

The trial commenced on March 25, 2014. The prosecution called five witnesses: Carmen Cruz, Detective Sean Roche, Police Officer Gaetano Emmolo, Sergeant John Capozzi, and Samantha Rappa-Giovagnoli, Criminalist Level II. Dkt. 12-1.

Rappa-Giovagnoli -- the investigative analyst assigned to this case and an expert in forensic and DNA testing -- testified as to the OCME's general DNA testing

6

responsibilities and procedures as well as the DNA testing, reports, and comparisons conducted in this case. *Id.* at 696-746. She explained that the OCME first conducted a profiling and analysis of the green towel and cigarette left at the crime scene. DNA was extracted from each item of evidence; both items bore a single male DNA profile -- later identified as the DNA profile of Davis. *Id.* at 706-10, 714-16. Next, the OCME used the Kastle-Meyer test to test a sample with a reddish-brown presence recovered from "a swab from the floor moulding between [the] rear and kitchen dining room." *Id.* at 711. The Kastle-Meyer test "is a presumptive test for blood" -- "[i]f there is a positive reaction, you'll get a color change once you add the sample in with the reagents." *Id.* The OCME received a positive reaction, and the sample was sent "on for further testing for extraction and for the quantitation." *Id.* at 712. At the quantitation stage, however, "it was determined that there was not enough DNA present in that sample" to proceed for further testing. *Id.* In other words, the testing of what appeared to be blood was inconclusive as there was not enough DNA present. Accordingly, all testing stopped for the sample with a reddish-brown presence. *Id.*

   And finally, the OCME tested Davis's buccal swab and was able to develop a complete DNA profile. It then compared the DNA profile from the swab with the DNA profiles found on the green towel and cigarette at the crime scene; it also compared the DNA profiles found on the green towel and cigarette at the crime scene with a "known specimen number 9969815A from the New York State DNA data bank."

7

*Id.* at 715.  The DNA profiles were the same: a match to Davis.  *Id.* at 714-16.  Rappa-Giovagnoli conducted the analyses and authored the laboratory reports documenting the comparisons and conclusions, *id.; see also* Dkt. 12-3 at SSR 4-10, 117-18.  She also independently reviewed and interpreted the raw data that her colleagues generated while testing the evidence to "ensure that everything [was] accurate within [her] case file."  After determining that the other analysts had accurately performed their tasks, she signed off on the results.  Dkt. 12-1 at 726-27, 732-33, 743-44.

Davis did not present any witnesses.  *Id.* at 751.  On April 3, 2014, the jury found Davis guilty of two counts of first-degree burglary, one count of attempted first-degree robbery, one count of attempted second-degree robbery, and one count of second-degree assault.  Dkt. 12-2 at SR 12.  On June 6, 2014, the court determined that Davis was a persistent violent felony offender and sentenced him principally to concurrent, indeterminate terms of 22 years to life on each count.  Dkt. 12-4 at 15.

b. *The Direct Appeal*

Davis appealed to the Appellate Division, Second Department.  He asserted that his rights under the Sixth Amendment's Confrontation Clause were violated because the court allowed "[Rappa-Giovagnoli,] a criminalist who did not take part in the DNA testing, and who served only as a conduit for the conclusions of other analysts with whom she 'agreed to agree,' to introduce the DNA reports into evidence and to testify about the results of the testing."  Dkt. 12-2 at SR 12.  He argued that (1) the

8

DNA reports and comparison were testimonial, and (2) the prosecution "failed to call a witness who participated in the DNA testing or conducted an independent review of the raw data." *Id.* at SR 14-22.

Davis based his argument on *Crawford v. Washington*, 541 U.S. 36 (2004), and the then-recently decided New York Court of Appeals case *People v. John*, 52 N.E.3d 1114 (N.Y. 2016). Dkt. 12-2 at SR 12-14. Davis conceded that this argument was unpreserved because he did not object to the DNA evidence on confrontation grounds; however, he asked that the court review it in the interest of justice. *Id.* at SR 20-22. Davis contended that although *John* had not been decided before his 2014 trial, federal courts have established that a defendant has the right to face the witnesses again him. *Id.* at SR 21.

The Appellate Division unanimously affirmed Davis's conviction. *Davis I*, 96 N.Y.S.3d at 886. The court held that (1) Davis's *John* argument was "unpreserved for appellate review" and "decline[d] to review it in the exercise of [its] interest of justice jurisdiction"; and (2) the evidence presented at trial "was legally sufficient to establish the defendant's guilt beyond a reasonable doubt of the crimes of which he was convicted." *Id.* (citations omitted).

On July 11, 2019, the New York Court of Appeals denied leave. *Davis II*, 130 N.E.3d at 1287.

9

2.  *The Petition*

In 2020, proceeding *pro se*, Davis filed the Petition pursuant to 28 U.S.C. § 2254.  Dkt. 1.  In his Petition, Davis asserts the same argument that he raised before the Appellate Division: his rights under the Sixth Amendment's Confrontation Clause were violated because the court allowed "[Rappa-Giovagnoli,] a criminalist who did not take part in the DNA testing, and who served only as a conduit for the conclusions of other analysts with whom she 'agreed to agree' to introduce the DNA reports into evidence and to testify about the results of the testing." *See id.* at 2; Dkt. 12-2 at SR 14-16. This claim is the only ground upon which Davis challenges his conviction.  Dkt. 1 at 2.

After being granted three extensions to file an answer, the prosecution filed a response and a memorandum of law in opposition to the Petition on February 2, 2021.  Dkt. 12; Dkt. 12-1.  Davis did not file a reply.  The case was reassigned to the undersigned on October 25, 2023.

## DISCUSSION

I.  *Federal Review of State Convictions*

A federal court cannot review a habeas petition unless the petitioner "has exhausted the remedies available" in state courts.  28 U.S.C. § 2254(b)(1)(A).  This requirement affords state courts the "opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Jackson v. Edwards*, 404 F.3d 612, 619 (2d Cir. 2005) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)).  "This requires that the

prisoner 'fairly present' his constitutional claim to the state courts, which he accomplishes 'by presenting the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it.'" *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) (quoting *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005)).

Moreover, "federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" *Cone v. Bell*, 556 U.S. 449, 465 (2009) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). In other words, if the state court refused to consider an argument because it was procedurally barred under state law, it is barred from federal habeas review as long as the procedural bar is "adequate to support the judgment." *Murden v. Artuz*, 497 F.3d 178, 191-92 (2d Cir. 2007) (quoting *Jimenez v. Walker*, 458 F.3d 130, 138 (2d Cir. 2006)). A petitioner's failure to comply with a state procedural rule qualifies as such an adequate and independent state ground, provided that (1) the state court actually "relied on the procedural bar as an independent basis for its disposition of the case," *Harris v. Reed*, 489 U.S. 255, 261-62 (1989) (citation omitted), and (2) the state procedural rule is "firmly established and regularly followed," *James v. Kentucky*, 466 U.S. 341, 348 (1984).

11

The Second Circuit has "held repeatedly that the contemporaneous objection rule" -- that state appellate courts will review only those errors of law that are presented contemporaneously such that the trial court is "reasonably prompted" to correct them -- "is a firmly established and regularly followed New York procedural rule." *Downs v. Lape*, 657 F.3d 97, 103-04 (2d Cir. 2011) (collecting cases). Hence, the Circuit has affirmed the denial of habeas relief based on the Appellate Division's ruling that a petitioner's failure to object at trial rendered a claim unpreserved for appellate review. *See, e.g., Garcia v. Lewis*, 188 F.3d 71, 81-82 (2d Cir. 1999) (affirming the denial of habeas relief where the petitioner's trial counsel failed to bring to the trial court's attention a claim that he later attempted to advance on appeal). If a claim is procedurally barred pursuant to an independent and adequate state rule, a federal habeas court may not review it on the merits unless the petitioner demonstrates (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law" or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 722; *see, e.g., DiSimone v. Phillips*, 461 F.3d 181, 190 (2d Cir. 2006) (citation omitted).

II.  *Analysis*

In his Petition, Davis asserts one claim: his rights under the Sixth Amendment's Confrontation Clause were violated because the court allowed ""[Rappa-Giovagnoli,] a criminalist who did not take part in the DNA testing, and who served

12

only as a conduit for the conclusions of other analysts with whom she 'agreed to agree' to introduce the DNA reports into evidence and to testify about the results of the testing." Dkt. 1 at 2. He specifically argues that (1) the DNA reports and comparison were testimonial, and (2) the prosecution "failed to call a witness who participated in the DNA testing or conducted an independent review of the raw data." *Id.* at 14-22.

A.   *Procedural Bar*

As a threshold matter, the Appellate Division held that Davis's claim was "unpreserved for appellate review." It declined to "review it in the exercise of [the court's] interest of justice jurisdiction." *Davis I*, 96 N.Y.S.3d at 886 (citation omitted). In his appeal to the Appellate Division, Davis conceded that his claim was unpreserved because he did not object to the DNA evidence on confrontation grounds. Dkt. 12-2 at SR 20-21.

Habeas relief is thus not available to Davis for his claim. For an independent and adequate state ground to bar habeas relief, the state court rendering must "clearly and expressly state that its judgment rests upon a state procedural bar." *Whitley v. Ercole*, 642 F.3d 278, 286 (2d Cir. 2011) (quoting *Glenn v. Bartlett*, 98 F.3d 721, 724 (2d Cir. 1996)). Here, the Appellate Division clearly and expressly stated that Davis's claim was unpreserved for appellate review. *Davis I*, 96 N.Y.S.3d at 886.

Moreover, Davis has failed to demonstrate that he is entitled to an exception to the procedural default rule because he has not shown either (1) "cause for

13

the default and actual prejudice as a result of the alleged violation of federal law" or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

As discussed below, neither prejudice nor a miscarriage of justice exists because Davis's claim fails on the merits.

**B.   *The Merits***

**1.   *Relevant Case Law***

The Sixth Amendment's Confrontation Clause provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. Amend. VI. In *Crawford*, the Supreme Court held that "out-of-court statements by witnesses that are testimonial are barred, under the Confrontation Clause, unless witnesses are unavailable and defendants had prior opportunity to cross-examine witnesses, regardless of whether such statements are deemed reliable by court." 541 U.S. at 54, 58. It specifically identified "[v]arious formulations of th[e] core class of 'testimonial' statements" that are barred absent cross-examination:

> (1) "*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially";

>  (2) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; and
>  (3) "statements . . . made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

*Id.* at 51-52 (citations omitted). The Supreme Court has made clear that the Confrontation Clause applies to forensic reports and testimony being offered to prove a fact in a criminal trial. *See, e.g., Bullcoming v. New Mexico,* 564 U.S. 647, 657-63 (2011) (holding that the Confrontation Clause does not "permit the prosecution to introduce a forensic laboratory report containing a testimonial certification, made in order to prove a fact at a criminal trial, through the in-court testimony of an analyst who did not sign the certification or personally perform or observe the performance of the test reported in the certification"); *Melendez-Diaz v. Massachusetts,* 557 U.S. 305, 329 (2009) (holding that "[t]he Sixth Amendment does not permit the prosecution to prove its case via *ex parte* out-of-court affidavits" by an individual that has not been subjected to cross-examination); *Williams v. Illinois,* 567 U.S. 50, 83-84 (2012) (plurality opinion) ("We [have] emphasized that if a statement is not made for 'the primary purpose of creating an out-of-court substitute for trial testimony,' its admissibility 'is the concern of state and federal rules of evidence, not the Confrontation Clause.'" (quoting *Michigan v. Bryant,* 562 U.S. 344, 358-59 (2011))).

Consistent with the Supreme Court precedent outlined above, the New York Court of Appeals has held that the Confrontation Clause is violated when

15

laboratory reports as to the DNA profile generated from evidence submitted to a laboratory by the police in a pending criminal case are admitted into evidence and the analyst who generated or independently reviewed the DNA profile is not present for or has not been subject to cross-examination. *People v. John*, 52 N.E.3d 1114, 1123-24 (N.Y. 2016). It concluded that "an analyst who witnessed, performed or supervised the generation of [a] defendant's DNA profile, or who used his or her independent analysis on the raw data, as opposed to a testifying analyst functioning as a conduit for the conclusions of others, must be available to testify." *Id.* at 1128.

    2.    *Davis's Confrontation Rights*

Davis argues that his Sixth Amendment rights were violated because (1) the DNA reports and comparison were testimonial, and (2) the prosecution "failed to call a witness who participated in the DNA testing or conducted an independent review of the raw data." Dkt. 1 at 14-22. The prosecution disputes that the DNA evidence was "testimonial for the purposes of [Davis's] confrontation rights"; however, it maintains that the admission of the DNA evidence satisfied federal and state law. Dkt. 12-4 at 27-37.

Here, there were three DNA reports: one each for the cigarette, green towel, and buccal swab. Two comparisons were performed: one comparing the DNA from the cigarette and green towel with the specimen in the New York State database and one comparing the DNA profile from Davis's oral swab with the DNA profile from

16

the cigarette and green towel. Even assuming that the DNA reports and comparisons were testimonial, Davis's Sixth Amendment rights were not violated, for Rappa-Giovagnoli participated in the DNA testing and conducted an independent review of the data.

At trial, People's Exhibits 8 and 9 -- detailing the DNA reports generated from the cigarette, towel, and buccal swab -- showed that Rappa-Giovagnoli was listed as the analyst or "interpreting analyst." Her name, signature, or initials are included on nearly every page of the DNA reports. *See generally* Dkt. 12-3 at SSR 1-167. And on direct examination, Rappa-Giovagnoli testified that she:

    (1) generated and produced a DNA profile from the DNA material found on the cigarette and green towel, Dkt. 12-1 at 706-10, 720;

    (2) confirmed that the DNA material found on the cigarette and green towel left at the crime scene "came from one individual," *id.* at 709-10;

    (3) generated and produced a DNA profile from Davis's buccal swab and compared it to the profile developed from the cigarette and green towel -- all three profiles matched Lashawn Davis, *id.* at 714-15, 720-22;

    (4) compared the DNA profiles from the green towel and cigarette with a "known specimen" in the New York State DNA databank -- all three matched Lashawn Davis, *id.* at 715, 720-21;

    (5) performed "a statistical analysis of how often [she] would see the profile from the crime scene evidence of this case" in the random population, *id.* at 721-22; and

(6) confirmed that Lashawn Davis was the source of the DNA recovered from the cigarette and green towel, *id.* at 714, 722.

Further, on direct examination, Rappa-Giovagnoli reinterpreted the data from the DNA reports and comparisons for the jury using the prosecution's chart, which summarized the DNA results. She also confirmed that the data in the prosecution's chart was "representative of the information in [her] file from [her] analysis." *Id.* at 716-22; *see also* 12-3 at SSR 168-69 (Exhibit 10: the prosecution's DNA profile comparison chart).

Rappa-Giovagnoli was subject to extensive cross-examination regarding her role in testing, evaluating, and comparing the evidence and DNA profiles generated in this case. Dkt. 12-1 at 722-42. On cross-examination, she explained that due to the volume of DNA evidence that needs to be tested, the OCME uses a rotation system. Thus, each OCME analyst receives the same training and can participate in the DNA testing in any given case. *Id.* at 724-25; *see also id.* at 742-43 (describing the OCME's rotation system in more detail). But Rappa-Giovagnoli made clear that as the interpreting analyst in this case, she was required to review and interpret "everything" independently -- that is, the raw data and DNA results that her colleagues generated while testing the evidence or extracting DNA from the evidence -- to "ensure that everything [was] accurate within [her] case file." She signed off on the results only after reviewing all of the DNA results and determining that the other OCME analysts had accurately performed their tasks. *Id.* at 726-27, 732-33.

On redirect, Rappa-Giovagnoli reiterated that she was responsible for "go[ing] through each step of the case file before it [got] to [her] to ensure everything was performed correctly." *Id.* at 743-44. *See, e.g., Washington v. Griffin*, 876 F.3d 395, 407 (2d Cir. 2017) ("[T]he Supreme Court has never held that the Confrontation Clause requires an opportunity to cross examine each lab analyst involved in the process of generating a DNA profile and comparing it with another[.]"); *Beckham v. Miller*, 366 F. Supp. 3d 379, 385 (E.D.N.Y. 2019) ("By having the opportunity to cross-examine the criminalist who performed the final step of linking [the defendant's] DNA to the crime scene DNA evidence—the only accusatory step of the entire testing process and the step most helpful to criminal prosecution—[the defendant's] right to confrontation was satisfied." (citing *Bullcoming*, 564 U.S. at 664)).

In light of this evidence, Rappa-Giovagnoli was not a mere "conduit"; instead, she was the proper witness to call regarding the testing, evaluating, and comparing of the DNA profiles generated in this case. *See, e.g., Bullcoming*, 564 U.S. at 657-58; *John*, 52 N.E.3d at 1123-24, 1128. Accordingly, habeas relief is not available to Davis on this basis.

## *CONCLUSION*

Davis has failed to show a basis for relief under 28 U.S.C. § 2254. Accordingly, the Petition is denied. Additionally, I decline to issue a certificate of appealability because Davis has not made a substantial showing of the denial of a

19

constitutional right.  *See* 28 U.S.C. § 2253.  Pursuant to 28 U.S.C. § 1915(a)(3), I certify that any appeal taken from this decision and order would not be taken in good faith.

The Clerk of the Court shall enter judgment accordingly and close this case, and mail copies of this memorandum decision and the judgment to Davis at the Greenhaven Correctional Facility.

SO ORDERED.

Dated:   New York, New York
         February 22, 2024

DENNY CHIN
United States Circuit Judge
Sitting By Designation